# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-24298-CIV-LENARD

**UNITED STATES OF AMERICA**
**and the STATE OF FLORIDA, ex rel.**
**CHARLES C. WILHELM, M.D.,**

      Plaintiff,

**v.**

**MOLINA HEALTHCARE OF FLORIDA,**
**INC. and MOLINA HEALTHCARE, INC.,**

      Defendants.

_____/

## <u>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (D.E. 34)</u>

**THIS CAUSE** is before the Court on Defendant Molina Healthcare of Florida, Inc.'s ("Molina")[1] Motion to Dismiss, ("Motion," D.E. 34), filed September 15, 2014. Plaintiff/Relator Charles C. Wilhelm, M.D. ("Plaintiff") filed a Response on November 7, 2015, ("Response," D.E. 41), to which Defendant filed a Reply on December 3, 2015, ("Reply," D.E. 46).  Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

---

[1]     The Complaint also names, Molina Healthcare, Inc., as a defendant.  However, in his Response brief, Plaintiff consented to the dismissal of Molina Healthcare Inc., and stated that he does not intend to pursue the conspiracy allegation contained in paragraph 168 of the Complaint.  (Resp. at 1 n.1.)  Accordingly, the Complaint is hereby dismissed as to the claims against Molina Healthcare, Inc.

## I.    Background[2]

Plaintiff is a medical doctor who has been the Chief Medical Officer of Health System One ("HS1"), a privately-held administrative services organization that provides a variety of medical management services both nationally and internationally.  (Compl. ¶¶ 17-18.)  HS1 created, managed, and owned (in part) Florida NetPass, LLC ("FNP"), which was a managed care organization ("MCO") in which Plaintiff had an indirect ownership interest.  (Id. ¶¶ 30-32.)

To facilitate their entry as a Florida Medicaid health maintenance organization ("HMO"), Molina purchased FNP which was already serving approximately 55,000 Florida Medicaid beneficiaries.[3]  (Id. ¶ 31.)  Molina's contract with the State of Florida provided for a full-risk managed care plan based on fixed monthly capitation payments. (Id. ¶ 34.)  Under this contract, Molina received a fixed monthly amount per member to manage and cover all of its member's benefits, and Molina remained fully at risk for all payments to providers for services provided to the plan's enrolled members.  (Id.)  Under the capitation plan, Molina received a fixed amount of money for each member regardless of how many services or benefits were used by that member.  (Id. ¶ 35.)  In this way, Molina's revenue was largely dependent on the health of its members—the more unhealthy members that were enrolled, the more benefits Molina had to pay.  (Id.)

_____

[2]      Unless otherwise noted, the following facts are gleaned from Plaintiff's Complaint.  (D.E. 1.)

[3]      An HMO is a type of MCO.  See "Managed Care Organization," MedLine Plus, Merriam Webster Medical Dictionary, available at http://www.merriam-webster.com/medlineplus/managed+care+organization (last visited Sept. 18, 2015).

It was under this arrangement that Molina was approved as a Medicaid MCO and beneficiaries were transferred from FNP and enrolled into Molina's plan.  (Id. ¶ 36.)

In the months following Molina's acquisition of FNP, many of the plan's sicker members disenrolled and membership decreased significantly from the pre-transition membership figures.  (Id. ¶ 38.)  According to Plaintiff, "this disenrollment was the direct result of the purposeful failure of Defendants to timely perform necessary actions to assure continuity and quality of care and provide care coordination and case management services."  (Id. ¶ 39.)  "Defendants were motivated to shed their sicker and unprofitable members for at least two reasons: First, because under the terms of their purchase of FNP, the final purchase price was to be based on the number of FNP members remaining after a certain period of time following transfer of members."  (Id. ¶ 40.)  "Therefore, disenrolling members lowered the purchase price."  (Id.)  "Second, by eliminating the sickest (and thus most expensive) members, Defendants' operating expenses were significantly reduced and their Medical Loss Ratio Improved."  (Id.)  "With the average per-member-per-month (PMPM) expense for members with chronic diseases being $2,185.56 and the average capitation income/revenue being $820.16, Defendants were strongly motivated to have them disenroll."  (Id. ¶ 120.)

Plaintiff alleges that Molina encouraged disenrollment by inconveniencing members and providers, delaying and withholding benefits to members, delaying and withholding benefits to providers, and creating uncertainty as to coverage.  (Id. ¶ 41)  "Defendants' actions knowingly violated material conditions of payment, compliance with which was necessary to entitle them to receive capitation payments from the State of

Florida." (Id. ¶ 42.)  "Those payments consisted of both federal and state funds, and the claims for those payments, by virtue of defendants' knowing noncompliance with conditions of payment . . . violated the federal and Florida False Claims Acts" ("FCA").[4] (Id.)

In 2010, Plaintiff participated in a private lawsuit against Molina that alleged that Molina breached the purchase agreement between Molina and FNP ("2010 Lawsuit"). See Physician Consortium Servs., LLC, et al. v. Molina Healthcare, Inc., Case No. 10-cv-21208-JLK (S.D. Fla. Apr. 15, 2010).  The complaint in the 2010 Lawsuit alleged, inter alia, that Molina "deliberately implemented a scheme designed to scare away, intimidate or frustrate the sicker and more infirm Florida NetPass members, which were disproportionately [Supplemental Security Income ("SSI")] enrollees" who were valued higher under the purchase agreement, "so that they would not enroll – or quickly disenroll – from its plan." (Id. ¶ 29.)  In this way, Molina reduced the final purchase price which, as previously mentioned, was based in part on how many FNP members remained enrolled in Molina's program after a certain period of time. (Id. ¶¶ 24, 29.) Judge King ultimately ordered the parties to arbitrate the issues in the 2010 Lawsuit, and the plaintiffs later voluntarily dismissed the case with prejudiced after a settlement was reached.  See Physician Consortium, Case No. 10-cv-21208-JLK (S.D. Fla. Dec. 16, 2011).

---

[4]        Although the Complaint asserts separate causes of action under the Federal and Florida FCA, the Parties agree that the statutes were materially identical during the relevant period. (Mot. at 4 n.3; Resp. at 6 n.4.)  Therefore, all references to the FCA refer to both the Federal and Florida FCA.

On December 5, 2012, Plaintiff filed the instant Complaint as a <u>qui tam</u> Relator on behalf of the United States, the State of Florida, and himself to recover damages and penalties arising from violations of the Federal Civil False Claims Act, 31 U.S.C. § 3729 <u>et seq.</u> (Count I) and the Florida False Claims Act, Fla. Stat. § 68.082(2).  (D.E. 1 ¶ 1.)  It alleges that

> Since January 1, 2009, when Molina began participating in the Florida Medicaid program, Defendants have violated the provider agreements and defrauded the Medicaid program through the following actions: 1) failing to provide promised member benefits; 2) failing to provide continuity of care to its transferred members; 3) failing to provide case/care management services to its members; 4) failing to create an adequate Preferred Drug List (PDL) and implement a plan for authorization of previously prescribed prescriptions for transferred members.

(<u>Id.</u> ¶ 78.)  Similar to the 2010 Lawsuit, the instant Complaint alleges that "[t]hese violations resulted in a disproportionate number of sicker beneficiaries (who utilize more services than healthier beneficiaries) quickly becoming dissatisfied with Defendants' managed care plan, disenrolling and returning to the State of Florida's traditional fee-for-service plan."  (<u>Id.</u> ¶ 4.)  "This illegal conduct, sometimes referred to as 'cherry picking,' caused the submission of false claims in violation of the False Claims Act."  (<u>Id.</u> ¶ 4.)

Plaintiff alleges that Molina has violated the Federal and Florida False Claims Acts by: (1) knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to the United States including claims for capitation payments for managed care services they did not provide, (<u>id.</u> ¶¶ 163, 173); (2) knowingly making, using, or causing to be made or used, false records and statements material to a false or

fraudulent claim, (id. ¶¶ 165, 175); (3) conspiring to defraud the government by getting the false or fraudulent claims allowed or paid, (id. ¶¶ 168, 177).

On March 12, 2014, the United States filed a Notice of Election to Decline Intervention.  (D.E. 18.)  Molina filed its Motion to Dismiss on September 15, 2014, arguing that the Complaint should be dismissed (1) for lack of subject matter jurisdiction pursuant to the FCA's public disclosure bar and (2) because it fails to specifically allege a violation of the FCA.  (Id. at 4-20.)

## II.    Legal Standards

Attacks on subject matter jurisdiction[5] under Federal Rule of Civil Procedure 12(b)(1) come in two forms: facial attacks and factual attacks.  Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  "'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'"  Id. at 1529 (quoting Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980)).  Factual attacks, like the one Molina wages here, "challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'"  Id. (quoting

---

[5]    Plaintiff argues that Molina's Motion incorrectly challenges subject matter jurisdiction because it bases its argument on the 1986 version of the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4) (2006), instead of the 2010 amended version of the public disclosure bar, 31 U.S.C. § 3730(e)(4) (2012).  (See Resp. at 5 n.3.)  Plaintiff appears to argue that while the 1986 version of the public disclosure bar was jurisdictional in nature, the 2010 version is not. See id. (collecting cases).  However, as will be explained in greater detail infra, the Court finds that the 1986 version of the public disclosure bar is applicable to this case and therefore Molina's challenge to subject matter jurisdiction is not improper.  See United States ex rel. Osheroff v. Humana, Inc., No. 10–24486–cv–SCOLA, 2012 WL 4479072, at *4 (S.D. Fla. Sept. 28, 2012).

Menchaca, 613 F.2d at 511).  Furthermore, where, as here, the facts necessary to sustain

jurisdiction do not implicate the merits of the plaintiff's cause of action:

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ.
> P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's
> jurisdiction—its very power to hear the case—there is substantial authority
> that the trial court is free to weigh the evidence and satisfy itself as to the
> existence of its power to hear the case.   In short, no presumptive
> truthfulness attaches to plaintiff's allegations, and the existence of disputed
> material facts will not preclude the trial court from evaluating for itself the
> merits of jurisdictional claims.

Id. (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.

1977); see also Garcia v. Copenhaver, Bell & Assocs, M.D.'s, P.A., 104 F.3d 1256, 1261

(11th Cir. 1997).

To the extent that Molina argues that Plaintiff failed to allege an FCA violation

with specificity, Rule 9(b) applies.  See Cooper v. Blue Cross & Blue Shield of Fla., Inc.,

19 F.3d 562, 568 (11th Cir. 1994) (agreeing with the district court that Rule 9(b) applied

to an FCA claim alleging that a health plan administrator improperly submitted claims to

Medicare); see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d

1301, 1308-09 (11th Cir. 2002).  Rule 9(b) provides that "[a] party must state with

particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what
> statements were made in what documents or oral representations or what
> omissions were made, and (2) the time and place of each such statement
> and the person responsible for making (or, in the case of omissions, not
> making) same, and (3) the content of such statements and the manner in
> which they misled the plaintiff, and (4) what the defendants obtained as a
> consequence of the fraud.

Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001); see also Cooper, 19 F.3d at 567 ("This pleading must include facts as to time, place, and substance of the defendant's alleged fraud."). In a qui tam action, "[t]he plaintiff's complaint must allege the details of the defendants [sic] allegedly fraudulent acts, when they occurred, and who engaged in them." Cooper, 19 F.3d at 568 (citing Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505 (11th Cir. 1988)); see also Clausen, 290 F.3d at 1310.

## III.  Discussion

"'[T]he purpose of the qui tam provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'" United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1497 (11th Cir. 1991) (quoting United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 18 (2d Cir. 1990)). Historically, the FCA's promise that the private party—or "relator"—could share in the damages recovered gave rise to "'parasitical suits' . . . in which the relator sued upon information copied from government files and indictments." Id. (citing United States ex rel. Stinson v. Provident Life & Accident Ins., 721 F. Supp. 1247, 1249 (S.D. Fla. 1989)). Congress amended the FCA in 1986, intending "to increase private citizen involvement in exposing fraud against the government while preventing opportunistic suits by private persons who heard of fraud but played no part in exposing it." Cooper, 19 F.3d at 565 (citing Williams, 931 F.2d at 1493).

One of the 1986 amendments "replaced the so-called Government knowledge bar with the narrower public disclosure bar." Schindler Elevator Corp. v. United States. ex

rel. Kirk, 563 U.S. 401, 131 S. Ct. 1885, 1894 (2011).  "[T]he public disclosure bar was

'an effort to strike a balance between encouraging private persons to root out fraud and

stifling parasitic lawsuits.'"  Id. (citing Graham Cnty. Soil & Water Conservation Dist. v.

United States ex rel. Wilson, 559 U.S. 280, 295 (2010)).  It provided:

> No court shall have jurisdiction over an action under this section based
> upon the public disclosure of allegations or transactions in a criminal, civil,
> or administrative hearing, in a congressional, administrative, or
> Government Accounting Office report, hearing, audit, or investigation, or
> from the news media, unless the action is brought by the Attorney General
> or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006).  In 2010, Congress amended the FCA's public

disclosure bar as part of the Patient Protection and Affordable Care Act (PPACA), Pub.

L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010).  It now provides:

> The court shall dismiss an action or claim under this section, unless
> opposed by the Government, if substantially the same allegations or
> transactions as alleged in the action or claim were publicly disclosed--
>> **(i)** in a Federal criminal, civil, or administrative hearing in which the
>> Government or its agent is a party;
>> **(ii)** in a congressional, Government Accountability Office, or other
>> Federal report, hearing, audit, or investigation; or
>> **(iii)** from the news media,
>
> unless the action is brought by the Attorney General or the person bringing
> the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2012).  Plaintiff argues that the 2010 version of the public

disclosure bar applies, and that the bar is no longer jurisdictional in nature.  (See Resp. at

5-7 and n.3).[6]  Thus, Plaintiff argues that Molina's motion to dismiss is <u>not</u> one for lack of subject matter jurisdiction under Rule 12(b)(1).  (<u>Id.</u> at 5 n.3.)

Because it may affect whether the Court has subject matter jurisdiction over this action, the Court must begin by determining which version of the public disclosure bar applies to this case.  Molina's Motion assumes that because the allegedly wrongful conduct took place in 2009, the 1986 version of the public disclosure provision applies here.  (Mot. at 5 (citing <u>Graham Cnty.</u>, 559 U.S. at 283 n.1 ("The [2010 amendments to the FCA] make[] no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed [public disclosure] defense to a <u>qui tam</u> suit."); <u>United States ex rel. Osheroff v. Humana, Inc., et al.</u>, No. 10-cv-24486, 2012 WL 4479072, *4 n.8 (S.D. Fla. Sept. 28, 2012) ("[T]he previous version of the statute will apply to any alleged false claims made before March 23, 2010, and the amended version to any false claims made thereafter."))).)  Molina further argues that the Eleventh Circuit has determined that for purposes of the Court's retroactivity analysis, the focus is on the timing of the alleged submission of a false claim.  (<u>Id.</u> at 5 n.4 (citing <u>Makro Capital of Am., Inc. v. UBS AG</u>, 436 F. Supp. 2d 1342,

---

[6]      Citing <u>United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.</u>, 2013 U.S. Dist. LEXIS 75696, at *31 n.15 (N.D. Ga. May 17, 2013) ("Effective March 23, 2010, the public disclosure bar was amended to narrow its applicability and to make it a basis for dismissal, not a jurisdictional threshold"); <u>United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.</u>, 958 F. Supp. 2d 846, 857 n.6 (E.D. Tenn. July 29, 2013) ("[T]he pre-PPACA language made the public disclosure bar jurisdictional in nature whereas the post-PPACA language still provides a basis for dismissal but that basis is no longer jurisdictional"); <u>United States ex rel. Paulos v. Stryker Corp.</u>, 2013 WL 2666346, at *3 (W.D. Mo. June 12, 2013) ("After the 2010 amendment, the bar does is [sic] not described as jurisdictional in nature"); <u>Ping Chen ex rel. United States v. EMSL Analytical, Inc.</u>, 966 F. Supp. 2d 282, 294 (S.D.N.Y. 2013) ("absent such a clear statement, courts should treat the restriction as nonjurisdictional. . . . Not only is there such no clear statement . . . Congress deliberately <u>removed</u> such clear language from the provision").

1346-47 (S.D. Fla. 2006) (adopting the position of the Third and Ninth Circuits, which hold that the triggering event is the alleged presentation of a false claim), aff'd, 543 F.3d 1254, 1257 n.3 (11th Cir. 2008).

Plaintiff argues that the 2010 version of the public disclosure provision should apply.  (Resp. at 5-7.)  He argues that the Eleventh Circuit has instructed "that the version of the public disclosure bar 'in effect when [Relator] filed [his] FCA claim' controls." (Id. at 6 (quoting United States ex rel. Lewis v. Walker, 438 F. App'x 885, 887 n.1 (11th Cir. 2011) and citing Schindler, 131 S. Ct. at 1889 (applying "statute as it existed when the suit was filed")).)  He further argues that the "'focus of retroactivity analysis is the conduct that would be affected by the law'" which, he contends, is his ability to bring this qui tam lawsuit.  (Id. at 6-7 (quoting United States ex rel. Anderson v. N. Telecom, Inc., 52 F.3d 810, 814 (9th Cir. 1995)).)  Molina argues that Makro controls and that, in any event, the reasoning in Anderson was rejected by the Supreme Court two years later in Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939 (1997).

In Hughes Aircraft, the Supreme Court addressed whether the 1986 amendment to the FCA—which replaced the "government knowledge bar" with the "public disclosure bar"—applied retroactively.  520 U.S. at 941.  Briefly, in that case, the relator filed a qui tam action under the FCA in 1989 based upon false claims that were submitted between 1982 and 1984.  Id. at 942-43.  The information upon which the relator sued was known to the Government, but had not been publically disclosed, prior to the lawsuit.  Id.  Thus, the case could only proceed if the 1986 Amendments were retroactive and the public disclosure bar applied; otherwise, the government knowledge bar (which was in effect

11

when the false claims were submitted) precluded the relator's FCA claim.  See id. at 943-44.  Applying the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place," id. at 946 (internal citation and quotation marks omitted), the Supreme Court held that the 1986 amendment was not retroactive and that the district court should have dismissed the case pursuant to the government knowledge bar,  id. at 945, 952.  In doing so, it left open the question of what conduct triggers the retroactivity analysis, i.e., the pre-amendment submission of the false claim  or  the  post-amendment  disclosure  of  information  about  the  claim  to  the government.  See id. at 951-52.

In Makro, Judge Altonaga was faced with that very question.  436 F. Supp. 2d at 1346.  In that case, a plaintiff filed a private lawsuit on July 29, 2004 against the defendant and the United States.  Id. at 1344.  Judge Altonaga dismissed the original complaint with leave to amend and re-plead the claim as a qui tam action.  Id.  The plaintiff refiled the lawsuit as a qui tam action on June 27, 2005 alleging that the defendant had made false claims to the Government during World War II (when the government knowledge bar was still part of the FCA).  Id. at 1343-44.  However, the Government did not possess evidence or information concerning the false claims until 2004 (after the government knowledge bar had been repealed) when the plaintiff filed the original complaint in the private lawsuit.  See id. at 1348.

The  defendant  moved  to  dismiss  the  complaint  based  on  the  government knowledge bar.  Id.  The court's disposition of the motion hinged on whether the relevant conduct for the retroactivity analysis was (1) the making of the false claim (during World

War II) or (2) the date the Government came into possession of the relevant evidence or information.  Id. at 1346-47.  Judge Altonaga adopted the reasoning of the Third and Ninth Circuits, holding that the relevant conduct for purposes of the retroactivity analysis is the making of the false claim.  Id. (citing United States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 411 (3d Cir. 1999) ("[W]e conclude that we should use the date the claim was submitted for determining the retroactivity of the Grassley Amendment's 'public disclosure' bar to qui tam suits"); United States v. Hughes Aircraft Co., 162 F.3d 1027, 1031 (9th Cir. 1998) ("We conclude that the crucial event for purposes of non-retroactivity is the alleged presentation by Hughes of a false claim, and not the public disclosure of that conduct"); United States ex rel. Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1181 (D. Colo. 2001), rev'd, in part, on other grounds, 389 F.3d 1038 (10th Cir. 2004) (same)).  Because the government knowledge bar existed when the false claims were made, and because the government had evidence or information of the false claims at the time the relator filed his qui tam action, the Court determined that the plaintiff's claims were barred and dismissed the amended complaint.  Id. at 1347.  On appeal, the Eleventh Circuit affirmed, explicitly approving the at-issue legal conclusion in Judge Altonaga's order: "Since the relevant acts in this case took place prior to the [1986] repeal, the government knowledge bar would apply to these claims."  Makro Capital of Am., Inc. v. UBS AG, 543 F.3d 1254, 1257 n.3 (11th Cir. 2008).

Plaintiff completely ignores Makro in his Response.  Instead he relies on Anderson, a case in which (1) the allegedly false claims were submitted prior to the 1986 amendments to the FCA, (2) the relator provided the Government information concerning

the false claims in 1988, and (3) the relator filed a <u>qui tam</u> action against the defendant in 1990.  52 F.3d at 812.  Thus, the false claims were submitted when the government knowledge bar was in effect and the Government had knowledge of the false claims when the lawsuit was filed.  <u>See</u> <u>id.</u>  The Ninth Circuit held that because the 1986 amendments affected only the <u>relator's</u> rights, <u>i.e.</u>, his right to file a lawsuit notwithstanding the government's knowledge, the 1986 amendment should apply to his conduct.  <u>Id.</u> at 814-15.  Accordingly, the Ninth Circuit held that the public disclosure bar applied to the relator's suit, and that the district court erroneously dismissed the complaint based on the government knowledge bar.  <u>Id.</u> at 815.  However, as the Third Circuit noted in <u>Cantenkin</u>,

> The main problem with <u>Anderson</u> is that its reasoning rested heavily on the point that "the 1986 amendment did not change the legal consequences of [defendant] Northern Telecom's conduct."  52 F.3d at 814.  Since <u>Hughes</u> rejected that position and emphasized that the Grassley Amendments do "attach new disabilities" to a defendant's past conduct, we think that <u>Anderson</u>'s authority has been undermined.

192 F.3d at 411.  Here, too, the 2010 FCA amendment attaches new disabilities to Molina's available defenses under the FCA, specifically, its ability to seek dismissal based upon (1) an earlier-filed lawsuit to which the Government was not a party and (2) the Government's responses to public records requests.  <u>Compare</u> 31 U.S.C. § 3730(e)(4)(A) (2012) <u>with</u> 31 U.S.C. § 3730(e)(4)(A) (2006).

In any event, the Court finds that <u>Makro</u> controls and that the date on which the false claim was made is the relevant date for purposes of retroactivity, or, more accurately, non-retroactivity.  436 F. Supp. 2d at 1347, <u>aff'd</u>, 543 F.3d at 1257 n.3; <u>see</u>

also Hughes Aircraft, 162 F.3d at 1031 (concluding that "the crucial event for purposes of non-retroactivity is the alleged presentation by [the defendant] of a false claim").  Here, the allegedly false claims were submitted to the Government in 2009.  (See Am. Compl. ¶ 78.)  Thus, the pre-2010 version (i.e., the 1986 version) of the FCA applies.  See Osheroff, 2012 WL 4479072, at * n.8 ("[B]ecause the 2010 amendments do not apply retroactively, see Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel Wilson, __ U.S. __, __ n.1, 130 S. Ct. 1396, 1400 n.1, 176 L. Ed. 2d 225 (2010), the previous version of the statute will apply to any alleged false claims made before March 23, 2010, and the amended version to any false claims made thereafter.").

As previously stated, the 1986 version of the FCA's public disclosure bar provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1988).  Under this provision, "[a] three part inquiry determines if jurisdiction exists: (1) have the allegations made by the plaintiff been publically disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information."  Cooper, 19 F.3d at 565 n.4.

Plaintiff concedes that under the 1986 version of the public disclosure bar, his allegations were publically disclosed and his Complaint is based upon those public

disclosures.   (Resp. at 9 ("Should the Court apply the 1986 public disclosure law, Dr. Wilhelm recognizes that the complaint his prior company filed against Molina contained enough information about Molina's practices to warrant a finding by the Court of statutorily-significant public disclosures.  The question would then become whether Dr. Wilhelm qualifies as an original source.").)   The Parties, however, dispute whether Plaintiff was an "original source" of that information.   (Compare Mot. at 10-12 with Resp. at 9-12.)

> Under the 1986 version of the public disclosure provision, an "original source" is
>
> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(2)(B) (2006); accord Cooper, 19 F.3d at 565.   "Knowledge is 'direct' if it is firsthand, 'marked by absence of an intervening agency, instrumentality, or influence.'"   United States ex rel. Lewis v. Walker, 738 F. Supp. 2d 1284, 1295 (M.D. Ga. 2010) (quoting United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 59 (1st Cir. 2009); see also United States ex rel. Newell v. City of St. Paul, Minn., 728 F.3d 791, 797 (8th Cir. 2013) ("'Direct knowledge' is first-hand knowledge; 'a person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA].'").   "'Independent knowledge' is 'knowledge not derived from the public disclosure.'"   Newell, 728 F.3d at 797; see also Lewis, 738 F. Supp. 2d 1295 ("Knowledge is 'independent' if it does not depend or rely on public disclosures.") (citing

<u>Ondis</u>, 587 F.3d at 59).   "In summary, a relator's knowledge is not 'direct and independent' if it is based on publicly disclosed documents." <u>Lewis</u>, 738 F. Supp. 2d at 1295; <u>see also</u> <u>Stinson</u>, 944 F.2d at 1159-60 (finding that information received through discovery in another lawsuit does not constitute direct and independent knowledge).

Molina argues that Plaintiff "developed his legal theories secondhand while 'serv[ing] as an expert [and] review[ing] documents and information uncovered during discovery in [other] individual lawsuits[.]"  (Mot. at 10 (quoting <u>McElmurray v. Consol.</u> <u>Gov't of Augusta-Richmond Cnty.</u>, 501 F.3d 1244, 1252 (11th Cir. 2007)).   It cites Plaintiff's deposition testimony from the 2010 Lawsuit in which he stated that his knowledge was based on "discovery representations" and "information from other people or [his] review of other documents."  (<u>Id.</u> (citing Wilhelm Dep. (D.E. 34-3) at 38:14-40:16, 42:8-10).  Molina further argues that the evidence reflects that other individuals brought the relevant information to the Government, (<u>id.</u> at 11-12 (citing M. Brown-Woofter Dep. (D.E. 34-4) at 76:2-77:15), and the fact that Florida Agency for Health Care Administration ("AHCA") was called as a witness in that case and provided a copy of the complaint was enough to alert the Government to Molina's alleged fraud, (<u>id.</u> at 12).

Plaintiff argues that "the bulk of his knowledge resulted from his personal experience and involvement."  (Resp. at 11.)  He argues that he "gained knowledge regarding Molina's fraud directly through meetings and correspondence with its personnel and certain physicians, and his personal investigations into its wrongful conduct."  (<u>Id.</u> at 10.)  He states that he received complaints concerning late claims

payments, late responses to authorization requests, and members not being assigned to their former primary care physicians.   (Id. at 10-11.)   "He understood from these conversations that physicians were encouraging NetPass members to leave Molina in order to gain better access to their pharmaceutical benefits."   (Id. at 11 (citing Wilhelm Dep. at 31).)   He further argues that "he discovered defendant's failure to meet conditions of payment regarding federal healthcare dollars in real time, as they were occurring, and independent of any public disclosure."   (Id.)

Upon careful review of the evidence presented, the Court finds that Plaintiff is not an original source of the publically-disclosed information.   The information at-issue concerns Molina's alleged failures to (1) provide promised member benefits, (2) provide continuity of care to its transferred members, (3) provide case/care management services to its members, and (4) create an adequate Preferred Drug List and implement a plan for authorization of previously prescribed prescriptions for transferred members.   (See Compl. ¶ 78.)   These failures allegedly caused Molina's sicker beneficiaries to disenroll, violated Molina's Provider Agreement with AHCA, and, consequently, violated the FCA. (Id. ¶¶ 3-4; see also id. ¶¶ 40, 78, 96-111, 104-08.)

To begin with, each of these allegations was raised in the 2010 Lawsuit.   See Physician's Consortium, Case No. 10-cv-21208-JLK, D.E. 1 ¶ 37(e) (alleging that Molina's "business plan all along was to shed members who had high medical-loss ratios"); id. ¶ 37(n) ("Molina Florida did not . . . comply with all the terms and conditions of related AHCA contracts"); id. ¶ 37(c) ("Molina . . . failed to maintain continuity of care for SSI and TANF [temporary assistance for needy families] enrollees who initially

transferred from Florida NetPass, particularly for pharmacy benefits."); id. ("There were many mix ups which caused many enrollees great frustration with their inability to fill essential prescriptions for medications.  Molina . . . also delayed in issuing authorizations, which hindered enrollees' access to care; botched enrollee assignments to their primary care physicians whom they had previously been assigned under Florida NetPass; and its hospital network was not timely approved and in place, causing more delays in accessing services.").

During the 2010 Lawsuit, Dr. Wilhelm testified that it was his "opinion" that during the transition from FNP to Molina, Molina was more focused "on the bottom line of operations than on the quality of care, continuity of care to the members." (Wilhelm Dep. at 37:12-18.)  Plaintiff gave three specific examples of why he held this opinion, which related to (1) Molina's claims payment system, (2) the transfer of information from FNP to Molina, and (3) its disease management system.  (See id. at 38:7-40:11.)  With respect to the first, Plaintiff admitted that the basis of his knowledge was "discovery representations" and that he had no personal knowledge of Molina's claims payment system.  (Id. at 42:15-20.)  With respect to the second, Plaintiff admitted that he had no personal knowledge of how FNP's information was integrated into Molina's system.  (Id. at 41:15-18.)  With respect to the third, Plaintiff admitted that he had "no personal knowledge of what Molina Florida did as [he is] not privy to that information."  (Id. at 42:1-4.)

> **Q.    Is it fair to say, then, the three examples you've just given to me are based on information you've gotten from other people?**

> A.    It's fair to say that it's based on information from other people or my review of other documents.

(Id. at 42:5-10.)  Plaintiff also testified that his opinion that Molina encouraged sicker members to disenroll was based on the same secondhand knowledge that informed his opinion that Molina was focused on the bottom line.  (Id. 44:17-22; see also id. at 53:1-11 (stating, in response to whether he has any personal knowledge other than the acts described above to support his opinion that Molina wanted to shed members, that he had "not reviewed all the documents of discovery, so nothing I wish to speak about at this point").

Furthermore, Plaintiff's Complaint relies, in part, on the deposition testimony of other people from the 2010 Lawsuit.  (Compl. ¶ 107 ("Don Hairston, former President of Molina Healthcare of Florida, testified that early in the transfer period 55% of all claims were being 'pended.'"); id. ¶ 128 (stating that Molina's Director of Utilization Management testified "that she did not engage in any analysis to determine the needs of FNP members who were being transferred to Defendants' health plan and did not know whether anyone in Molina did that analysis"); id. ¶¶ 130-32 (stating that Molina's Complex Case Manager testified that her initial training did not include case management training).

The Court finds that this information cannot be the basis of a qui tam suit because it is not "direct and independent knowledge" as required by 31 U.S.C. § 3730(e)(2)(B) (2006).  See McElmurray, 501 F.3d at 1547 (finding that documents acquired during discovery in a previous lawsuit constitute a "public disclosure" which cannot be the basis

of a qui tam suit under the FCA); Stinson, 944 F.2d at 1159-60 (finding that information received through discovery in another lawsuit does not constitute direct and independent knowledge); United States ex rel. Fine v. MK-Ferguson Co., 99 F.3d 1538, 1547 (10th Cir. 1996) ("[I]ndependent knowledge is knowledge which is not secondhand knowledge.").   Plaintiff argues that he is an original source because he "gained significant knowledge regarding Molina's conduct through his meetings with its personnel and other physicians with whom he was in regular contact[.]"  (Resp. at 41.) However, the Third Circuit recently held that such knowledge is indirect knowledge. United States ex rel. Schumann v. Astrazeneca Pharms. L.P., 769 F.3d 837, 848 (3d Cir. 2014) (stating that the relator's "knowledge is not direct because it came from reviewing documents and discussing them with colleagues who participated in the underlying events") (citing United States ex rel. Paranich v. Sorgnard, 396 F.3d 326, 335-36 (3d Cir. 2005); Stinson, 944 F.2d at 1160-61).   Simply put, the "knowledge" upon which Plaintiff's qui tam Complaint is based is "derivative of the information of others" and/or "dependent on a public disclosure."   United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160, 1162 (10th Cir. 1999).  It is therefore not "direct and independent," Plaintiff is therefore not an "original source," and the Court therefore lacks jurisdiction over the Complaint.  31 U.S.C. § 3730(e)(4)(A) (2006) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations . . . unless the . . . person bringing the action is an original source of the information.")

**IV.    Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that:

**1.**    Defendant's Motion to Dismiss (D.E. 34) filed September 15, 2014 is

**GRANTED**;

**2.**    Plaintiff's Complaint for Violations of the False Claims Act (D.E. 1) filed

December 5, 2012 is **DISMISSED WITH PREJUDICE**;

**3.**    All pending motions are **DENIED AS MOOT**; and

**4.**    This case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 22nd day of

September, 2015.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**